UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RISING DOUGH, INC. (d/b/a MADISON
SOURDOUGH), WILLY MCCOYS OF
ALBERTVILLE LLC, WILLY MCCOYS
OF ANDOVER LLC, WILLY MCCOYS
OF CHASKA LLC, WILLY MCCOYS
OF SHAKOPEE LLC,                                    Case No.: 2:20-CV-00623-JPS
WHISKEY JACKS OF RAMSEY LLC
(d/b/a WILLY MCCOYS RAMSEY), GREEN HILLS
GRILLE, LLC, AND CASH-MCKEOWN FUTURES LLC,
individually and on behalf of all others similarly situated,

        Plaintiffs,

   v.

SOCIETY INSURANCE,

        Defendant.

**SOCIETY INSURANCE, A MUTUAL COMPANY'S, BRIEF IN SUPPORT OF MOTION
TO DISMISS PURSUANT TO FED. R. CIV. PRO. 12(b)(6)**

Plaintiffs, various restaurants and bars in Wisconsin, Minnesota and Tennessee have filed this Class Action lawsuit against Society Insurance, A Mutual Company, ("Society") seeking coverage for loss of business income and extra expense resulting from the suspension or reduction of their operations after the Governors of Wisconsin, Minnesota and Tennessee issued orders related to the COVID-19 pandemic.

Plaintiffs' premises and property were not physically damaged or destroyed. Plaintiffs were allowed and encouraged to continue takeout and delivery service. Plaintiffs were not prohibited from accessing their premises or producing their products. Under these circumstances, the Society policy does not provide coverage.

There is no coverage for Plaintiffs' claimed loss of business income/extra expense under the Society policy for the following reasons: (1) There is none under the Business Income or Extra Expense coverages because Plaintiffs have not suffered a direct physical loss of or damage to covered property; (2) There is none under the Civil Authority coverage because Plaintiffs' alleged loss of business income was not caused by civil authority that prohibited access to Plaintiffs' premises in response to either (a) damage to other property or (b) dangerous physical conditions; (3) There is none under the Contamination coverage because Plaintiffs' alleged loss of business income was not caused by (a) contamination which resulted in action by a governmental authority that prohibited access to the premises or production of products, (b) a contamination threat, or (c) publicity resulting from the discovery or suspicion of contamination; and (4) There is none under the "Sue and Labor" Clause of the Policy because that provision is inapplicable to Plaintiffs' claims. For those reasons, and as more fully explained in this Brief, the Court should dismiss this action now. Further, because the policies are before this Court, dismissal should be with prejudice rather than with leave to replead.

- 1 -

## FACTUAL BACKGROUND

Governors around the country, including Wisconsin Governor Tony Evers, Minnesota Governor Tim Walz and Tennessee Governor Bill Lee entered Executive Orders that required restaurants and bars to stop providing food and beverages for on-premises consumption in order to enable social distancing and minimize the spread of COVID-19. As a result of those Executive Orders, Plaintiffs have had to temporarily limit their business to take out and delivery service, and have allegedly incurred a loss of income as a result.

### A.  Wisconsin Executive Orders Issued by Governor Evers

Emergency Order #5, issued on March 17, 2020 ("Order Prohibiting Mass Gatherings of 10 People or More") prohibited mass gatherings of 10 people or more. Wis. Emergency Order No. 5, available at https://evers.wi.gov/Documents/COVID19/UPDATEDOrder10People.pdf (March 17 2020).[1]  (App. 1) The Order also provided that effective at 5:00 p.m. on March 17, 2020, all bars and restaurants were to close for on-premises dining. However, restaurants were allowed to continue or even expand their business for take-out and delivery service.

 Emergency Order #8, issued on March 20, 2020 ("Updated Mass Gathering Ban") continued the closure of all bars and restaurants, but allowed restaurants to remain open for food take-out and delivery service. Wis. Emergency Order No. 8, available at https://evers.wi.gov/Documents/COVID19/EMO08-MassGathering10v.2.pdf (March 20, 2020). (App. 2) Bars were allowed to provide carryout sales of alcoholic beverages and food. In other words, for both restaurants and bars, for both the Order Prohibiting Mass Gatherings of 10

---

[1] In deciding a Rule 12(b)(6)  motion, a court may consider documents outside the Complaint if they are referred to in the Complaint and are central to plaintiff's claim. *Wright v Assoc. Ins. Cos. Inc.,* 29 F. 3d 1244, 1248 (7th Cir. 1994) For convenience, Defendant has also provided in its appendix of unpublished authorities copies of the relevant executive orders cited herein.

People or More and the Updated Mass Gathering Ban, restaurants and bars could change their business to take out or delivery but were not required to stop operating entirely.

Emergency Order #12, issued on March 24, 2020 ("Safer at Home Order") required non-essential business and operations to cease, effective March 25, 2020. Wis. Emergency Order No. 12, available at https://evers.wi.gov/Documents/COVID19/EMO12-SaferAtHome.pdf (March 24, 2020). (App. 3) However, restaurants and bars were not required to cease operations. They were permitted to continue to remain open for food take-out and delivery services. The Order also allowed customers to enter establishments for the purpose of ordering, pick up, and paying for food or beverage or both.

**B. Minnesota Executive Orders Issued by Governor Walz**

Executive Order 20-01, issued on March 13, 2020, ("Declaring a Peacetime Emergency and Coordinating Minnesota's Strategy to Protect Minnesotans from COVID-19") encouraged Minnesotans to help protect all Minnesotans by staying home, following guidance regarding hygiene and social distancing. Minn. Emergency Exec. Order No 20-01, available at https://www.leg.state.mn.us/archive/execorders/20-01.pdf (March 13, 2020). (App. 4)

Executive Order 20-04, issued on March 15, 2020, ("Providing for Temporary Closure of Bars, Restaurants, and Other Places of Public Accommodation") ordered restaurants, food courts, cafes, coffeehouses and other places of public accommodation offering food or beverage for on-premises consumption, as well as bars, taverns, brew pubs, breweries, microbreweries, distilleries, wineries, tasting rooms, clubs and other places of accommodation offering alcoholic beverages for on-premises consumption to close for on-premises dining. Minn. Emergency Exec. Order No. 20-04, available at https://www.leg.state.mn.us/archive/execorders/20-04.pdf (March 15, 2020). (App. 5) However, the Order actually encouraged these businesses to offer

food and beverage using delivery service, window service, walk-up service, drive-through service, or drive up service. This Order was in effect starting March 17, 2020 and continuing until March 27, 2020.

Executive Order 20-18, issued on March 25, 2020, ("Continuing the closure of Bars, Restaurants, and Other Places of Public Accommodation") continued the closure of public accommodations until May 1, 2020. Minn. Emergency Exec. Order No. 20-18, available at https://www.leg.state.mn.us/archive/execorders/20-18.pdf (March 25, 2020). (App. 6) However, carry-out and delivery business was no less encouraged.

Executive Order 20-20, also issued on March 25, 2020, ("Directing Minnesotans to Stay at Home") ordered Minnesotans to stay at home except to engage in certain activities, including to obtain necessary supplies and services, such as food, including delivery or carry-out services, and beverages. Minn. Emergency Exec. Order No. 20-20, available at https://www.leg.state.mn.us/archive/execorders/20-20.pdf (March 25, 2020). (App. 7) The restrictions on restaurants, bars and other places of public accommodation remained in effect— on-premises business was replaced by carryout and delivery.

### C. Tennessee Executive Orders Issued by Governor Lee

Executive Order #17, issued on or about March 22, 2020, prohibited restaurants, bars, and similar food or drink establishments from being open to the public, but the establishments could offer drive-through, pickup, carry-out, or delivery service for food or drink. Tenn. Exec. Order No. 17, available at https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee17.pdf (March 22, 2020). (App. 8) The Executive Order was issued in an effort to mitigate the impact and spread of COVID-19 because the Centers for Disease Control and Prevention

- 4 -

("CDC") found that "COVID-19 is frequently spread '[b]etween people who are in close contact with one another (within about 6 feet)."

Executive Order #21, issued on or about March 30, 2020, extended the effective duration of Executive Order #17 to April 14, 2020.  Tenn. Exec. Order No. 17, available at https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee21.pdf (March 30, 2020). (App. 9)  Executive Order #21 continued to "direct restaurants, bars and similar food and drink establishments to offer take-out or delivery options only."

Executive Order # 22, also issued on or about March 30, 2020 ordered all Tennesseans to stay home unless otherwise engaged in an enumerated essential service/activity to avoid exposure to and the spread of COVID-19.  Tenn. Exec. Order No. 17, available at https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee22.pdf (March 30, 2020). (App. 10) One of the enumerated essential services was "Restaurants for Off-Premises Consumption," allowing "restaurants, bars, or other similar food or drink establishments that prepare and serve food" to "provide the food on a carry-out basis only." Executive Order #22 also allowed the "minimum necessary activities required to maintain any business or organization."

Executive Order #27, issued on or about April 13, extended the duration of Executive Order #17 and #22 to April 30, 2020. Tenn. Exec. Order No. 17, available at https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee27.pdf (April 13, 2020).  (App. 11)

### D.  Plaintiffs' Allegations

Plaintiffs allege that they were forced to suspend or reduce their business due to COVID-19 and the resultant Executive Orders issued by the Governors of their respective states, and

- 5 -

were required "to take necessary steps to prevent further damage and minimize the suspension of business and continue operations." (Dkt. 14, Amended Compl. ¶¶ 12-15) They allege that Society issued Businessowners Policies to each of them, which included Business Income, Civil Authority, Contamination, Extra Expense and Sue and Labor Coverages. (Dkt. 14, Amended Compl. ¶¶ 28-37) Plaintiffs allege that the presence of virus or disease "can constitute physical damage to property" (Dkt. 14, Amended Compl. ¶43) and that "The presence of COVID-19 caused 'direct physical loss of or damage to'" their property, "by denying use of and damaging the Covered Property, and by causing a necessary suspension of operations during a period of restoration." (Dkt. 14, Amended Compl. ¶78)  Plaintiffs further allege that the Wisconsin, Minnesota, and Tennessee Orders "prohibited access to Plaintiffs' and the other Class members' Covered Property, and the area immediately surrounding Covered Property, in response to dangerous physical conditions resulting from a Covered Cause of Loss."  (Dkt. 14, Amended Compl. ¶79) Plaintiffs claim that they lost Business Income and incurred Extra Expense "as a result of the presence of COVID-19 and the Closure Orders."  (Dkt. 14, Amended Compl. ¶ 80)

Plaintiffs allege that Society breached their insurance contracts with respect to the Business Income, Civil Authority, Contamination, Extra Expense and Sue and Labor Coverages, and seek a Declaratory Judgment that their losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policies. (Dkt. 14, Amended Compl., Section VII -Request for Relief, p. 37)

### E.  The Society Policies

Society issued Businessowners policies of insurance to each Plaintiff.  The Policies include, in pertinent part, a Businessowners Special Property Coverage Form, form number TBP2 (05-15) subject to all the terms and conditions of coverage.  (Dkt. 14-1 – 14-9)

- 6 -

## LEGAL STANDARD ON MOTION TO DISMISS

The Seventh Circuit has summarized the legal standard on 12(b)(6) motions to dismiss as follows:

> We review a 12(b)(6) dismissal for failure to state a claim *de novo* and construe all well-pleaded facts and draw all inferences in the light most favorable to the nonmoving party. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). In order to survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). And while we draw all reasonable inferences and facts in favor of the nonmovant, we need not accept as true any legal assertions or recital of the elements of a cause of action "supported by mere conclusory statements." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013).

*Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014). Under this "plausibility" standard, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level.' That is, the complaint must contain 'allegations plausibly suggesting (not merely consistent with)' an entitlement to relief." *Alam*, 709 F.3d at 666 (quoting *Twombly*, 550 U.S. at 555, 557). In deciding a 12(b)(6) motion, courts "are free to consider 'any facts set forth in the [complaint] that undermine the [plaintiff's] claim.'" *ERA Franchise Sys., LLC v. Hoppens Realty, Inc.*, No. 12-CV-594-SLC, 2013 WL 3967869, at *5 (W.D. Wis. July 31, 2013) (quoting *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir. 1992)). (App. 12)

## ARGUMENT

The Wisconsin Supreme Court has set forth a three step procedure for interpretation of an insurance contract: first, the Court examines the facts of the insured's claim to determine whether the insuring agreement in the policy makes an initial grant of coverage. If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there. If coverage is triggered, the court examines the exclusions to see if they preclude coverage. Finally, if the exclusion has an exception, the Court analyzes the exception to see if it reinstates coverage.

- 7 -

*American Family Mut. Ins. Co. v. American Girl, Inc.,* 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N. W. 2d 65. The insured bears the burden of showing an initial grant of coverage. *Day v. Allstate Indem. Co.,* 2011 WI 24, ¶ 26, 332 Wis. 2d 571, 798 N.W. 2d 199. Tennessee and Minnesota are in accord. *See Blaine Const.Corp. v. Insurance Co. of North America,* 171 F. 3d 343, 349 (6th Cir. 1999) (applying Tennessee law); *Travelers Indem. Co. v. Bloomington Steel & Supply Co.,* 718 N.W.2d 888, 894 (Minn. 2006).

The Court will not interpret policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which no premium was paid. *American Family, supra,* at ¶23.

I.  **THERE IS NO COVERAGE UNDER THE BUSINESS INCOME AND EXTRA EXPENSE ADDITIONAL COVERAGES BECAUSE PLAINTIFFS CANNOT SHOW THAT THEY HAVE SUSTAINED DIRECT PHYSICAL LOSS OF OR DAMAGE TO COVERED PROPERTY**

A.  **The Insured's Property Has Not Been Physically Damaged**

The Society Policy provides as follows:

> A.  **Coverage**
>
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>
> ***
>
> **3. Covered Causes Of Loss**
> Direct Physical Loss unless the loss is excluded or limited under this coverage form.

(Dkt. 14-1, p. 55-56; Dkt. 14-2, p. 62-63; Dkt. 14-3, p. 85-86; Dkt. 14-4, p. 71-72; Dkt. 14-5, p. 43-44; Dkt. 14-6, p. 70-71; Dkt. 14-7, p. 45-46; Dkt. 14-8, p. 48-49; Dkt. 14-9, p. 50-51)

Plaintiffs allege that they suffered business income loss and extra expense loss. The Society Policy provides Additional Coverages for "Business Income" and "Extra Expense" pursuant to the following provisions:

## 5. Additional Coverages

***

### g. Business Income

**(1)** Business Income

**(a)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss……

**(b)** We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage.

(Dkt. 14-1, p. 59-60; Dkt. 14-2, p. 66-67; Dkt. 14-3, p. 89-90; Dkt. 14-4, p. 75-76; Dkt. 14-5, p. 47-48; Dkt. 14-6, p. 74-75; Dkt. 14-7, p. 49-50; Dkt. 14-8, p. 52-53; Dkt. 14-9, p. 54-55)

The term "period of restoration" is defined in the Policy as the period of time that:

a. Begins immediately after the time of direct physical loss or damage for Business Income or Extra Expense coverage caused by or resulting from any covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

(Dkt. 14-1, p. 85; Dkt. 14-2, p. 92; Dkt. 14-3, p. 115; Dkt. 14-4, p. 101; Dkt. 14-5, p. 73; Dkt. 14-6, p. 100; Dkt. 14-7, p. 75; Dkt. 14-8, p. 78; Dkt. 14-9, p. 80)

### h. Extra Expense

> **(1)** We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. …..
>
> \*\*\*
>
> **(4)** We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance.

(Dkt. 14-1, p. 60-61; Dkt. 14-2, p. 67-68; Dkt. 14-3, p. 90-91; Dkt. 14-4, p. 76-77; Dkt. 14-5, p. 48-49; Dkt. 14-6, p. 75-76; Dkt. 14-7, p. 50-51; Dkt. 14-8, p. 53-54; Dkt. 14-9, p. 55-56)

Pursuant to these provisions, an insured must sustain a loss of business income or extra expense due to suspension of the insured's operations caused by a "direct physical loss of or damage to covered property at the described premises."   Plaintiffs do not have such a claim, because they sustained no direct physical loss of or damage to covered property.

The term "physical" means "pertaining to real, tangible objects." Black's Law Dictionary (11th ed. 2019). In the insurance context, the "requirement that the loss be 'physical,'" is "widely held" to "preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10A Steven Plitt, et al. Couch on Insurance § 148:46 (3d ed. 1995).

Wisconsin Courts have recognized the requirement of physical loss or damage to establish a Covered Cause of Loss.   In *Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co*., 2000 WI 26, 233 Wis. 2d 314, 607 N.W. 276, a case involving a CGL policy, the insured failed to properly label certain products, which resulted in the products being sold for

less than half of their intended retail price.  When suit was brought against the insured, its insurer denied coverage on the grounds that no "property damage" had occurred.  The term "property damage" was defined in the policy, in part, as "Physical injury to tangible property…."  The Wisconsin Supreme Court determined that the term "physical injury to tangible property" was unambiguous, stating:

> Although the term "injury," standing alone, may refer broadly to both physical and non-physical types of damage, when it is qualified by the word "physical," its meaning is limited to physical damage.  Thus, as the court of appeals pointed out, the phrase "physical injury" ordinarily refers to some sort of physical damage.

*Id*. at ¶ 31.

In *Advance Cable Co., LLC v. Cincinnati Ins. Co*., 788 F. 3d 743 (7th Cir. 2015), the Court considered the meaning of "direct physical loss" in a case involving cosmetic hail damage to an insured's roof.  The Court noted that the insured was not asking for coverage of "intangible damage," but was claiming that the hail caused visible indentations to the roof surface.  In finding that there was "direct physical loss," the Court stated that "this denting changes the physical characteristics of the roof and thus satisfies that language of the policy." *Id*. at 747.

Two Wisconsin unpublished cases also address the meaning of "direct physical loss."  In *3303-05 Marina Road LLC v West Bend Mutual Insurance Company,* 2009AP1629, 2010 WL 3489391 (Wis. Ct. App. Sep. 8, 2010)  (App. 13) the Court noted:

> ……The Policies clearly state that they cover "direct physical loss of" the Property. The common and ordinary meaning of the word "physical" is "of or related to natural or material things as opposed to things mental, moral, spiritual, or imaginary," *see* Webster's Third New International Dictionary 1706 (1993); *see also Danbeck,* 245 Wis.2d 186, ¶ 10, 629 N.W.2d 150, while the common and ordinary meaning of the word "loss" is " 'the state or fact of being destroyed or placed beyond recovery,' " *see RTE Corp. v. Maryland Casualty Co.,* 74 Wis.2d 614, 624, 247 N.W.2d 171 (1976) (citation omitted); *see also Danbeck,* 245 Wis.2d 186, ¶ 10, 629 N.W.2d 150. That is to say, by including the word "physical" before "loss of ... Covered Property" the parties intended that the Policies cover material or tangible destruction of the Property, not financial

- 11 -

detriment resulting from a hasty investment. In suggesting that the Policies define "loss of" as "financial detriment," Michalski ignores the word "physical" in its entirety.

*3303-05 Marina Road LLC.* at ¶ 18.

Similarly, in *General Cas. Co. of Wisconsin v. Rainbow Insulators, Inc.,* 2010AP347 2011 WL 1162088 (Wis. Ct. App. March 31, 2011), (App. 14) the Court stated that the term "physical injury to tangible property" is unambiguous, and further noted:

> When "injury" is "qualified by the word physical, its meaning is limited to physical damage." *Id.* Accordingly, "the phrase 'physical' injury ordinarily refers to some sort of physical damage" to property, *id.,* such as "an alteration in appearance, shape, color, or in other material dimension." *See, e.g., Travelers Ins. Co. v. Eljer Mfg., Inc.,* 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d 481, 502 (Ill. 2001).

*General Cas. Co. of Wisconsin* at ¶ 14.

Courts in other jurisdictions have likewise found the term "direct physical loss" to require tangible damage to property. In Minnesota, a liability policy defined "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." The Court stated that "…a physical injury is damage or harm to the physical condition of a thing…..Physical injury to tangible property, therefore, involves damage to the physical condition of a palpable item of property." *Farm Bureau Mut. Ins. Co. v. Earthsoils, Inc*. 812 N. W. 2d 873, 876 (Minn. App. 2012); *See, also, Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co.*, 114 Cal. App. 4th 548, 556, 7 Cal. Rptr. 3d 844, 850 (2003), as modified on denial of reh'g (Jan. 7, 2004) ("direct physical loss" requires loss of something that "has a material existence, formed out of tangible matter, and is perceptible to the sense of touch"); *Universal Image Prods., Inc. v. Fed. Ins. Co*., 475 Fed. Appx. 569 (6th Cir. 2012) (requirement of "direct physical loss or damage" not met where presence of bacteria in air conditioning system did not cause tangible damage to insured premises) (App. 15); *Columbiaknit, Inc. v. Affiliated FM Ins.*

- 12 -

*Co.,* No. Civ. 98–434–HU, 1999 WL 619100, at *7 (D. Or. Aug. 4, 1999) (exposure of clothing to elevated spore counts was not "physical loss" in the absence of a "distinct and demonstrable physical change to the garment necessitating some remedial action") (App 16); *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23, ¶ 5, 884 N.E. 2d 1130, 1144 (Ohio Ct. App. 2008) (holding that mold does not constitute "physical damage" because "[t]he presence of surface mold did not alter or affect the structural integrity of the [property]").

There has been no alteration in the structure or composition of Plaintiffs' covered property, and therefore there has been no "direct physical loss of or damage to covered property at the described premises" and no "Covered Cause of Loss" within the meaning of the Society Policy. While Plaintiffs allege, in cursory fashion, that "the presence of COVID-19 caused 'direct physical loss of or damage to' each 'Covered Property' …. by denying use of and damaging the Covered Property, and by causing a necessary suspension of operations during a period of restoration" (Dkt. 14, Amended Compl. ¶ 78), the very Executive Orders relied on by Plaintiffs evidence that it is groups of people, without adequate social distancing, that are unsafe in <u>any</u> location because of COVID-19. The temporary suspension of certain use is not direct physical loss or damage, and Plaintiffs' conclusion is plainly incorrect.

Nor does the public safety impetus for the Executive Orders result in physical loss or damage. It is not Plaintiffs' premises themselves that are unsafe, but the possible threat of transmission among large groups of people within any area. This distinction is demonstrated by the fact that under each of the state's Governor's Executive Orders, Plaintiffs are allowed and encouraged to continue to operate on their premises for the purposes of selling food and beverages for off-premises consumption. Plaintiffs have not alleged that the structural integrity of any of their restaurants, bars or business personal property have been altered, or their physical

- 13 -

characteristics have been changed—the walls remain standing, the roofs have not been torn off, and the property remains untouched by fire or water—and, in fact, the Plaintiffs are still allowed to use the premises for preparing and serving food for takeout.  Consequently, Plaintiffs have not suffered the type of harm covered by the Society Policy, nor have they suffered a harm resulting from a Covered Cause of Loss.  Therefore, there is no coverage under the Society Policy for Plaintiffs' lost business income/extra expense due to the reduction of Plaintiffs' business operations.

**B.      The Partial Temporary Limitation of Plaintiffs' Operations is Not a "Physical" Loss or Damage as a Matter of Law.**

Plaintiffs' allegations that the Executive Orders have temporarily limited their ability to provide on-site consumption of food and beverages does not, as a matter of law, constitute a "physical" loss or damage.  This temporary, partial limitation of business operations is an intangible financial situation, not an alteration in the physical characteristics of the property.  There are no allegations in the Complaint that the appearance, shape, structural integrity, or any other physical characteristic of the property have changed.  Rather, Plaintiffs' alleged harm is an intangible change in the available business operations, similar to a change in zoning resulting in different hours a business can be open or a temporary suspension of a liquor license.

In *Roundabout Theatre Company v. Continental Casualty,* 302 A.D.2d 1 (N.Y. App. Div. 2002), the Appellate Division of the Supreme Court of New York held there was no "direct physical loss or damage" under an insurance policy where a plaintiff theater company lost all access to its premises due to a municipal order that closed the street the theater was located on.  The order was issued as a result of a construction accident on a nearby property, but the premises of the theater did not sustain any physical damage.  *Id*. at 3.  The street was closed for nearly a month "because of the substantial damage to the area and the danger from the partially collapsed

scaffold." *Id.* As a result, the theater was completely inaccessible to the public and forced to cancel all performances. *Id.* The court rejected the plaintiff's argument that "loss" should be read as including "loss of use" and held the policy unambiguously required direct physical damage to the theater itself for coverage. *Id.* at 7; *see also Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) (finding that the words "direct" and "physical" require "actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure").

The Eighth Circuit reached the same conclusion in *Pentair v. American Guarantee and Liability Insurance*, holding the mere loss of use and function of a factory was not a direct physical loss, where a factory in Taiwan was shut down due to an earthquake that disabled the electrical substation powering the factory. 400 F.3d 613 (8th Cir. 2005) (applying Minnesota law). Although the factory itself did not suffer any physical harm, it was unable to operate without power and the plaintiff sought to recover losses and extra expenses caused by the shutdown. *Id.* at 614. The insuring agreement provided coverage for "all risk of direct physical loss of or damage to" the property described in the agreement. *Id.* at 614. The court held that even though the factory could not perform its intended function, the mere loss of use or function did not constitute "direct physical loss or damage." *Id.* at 615-617.

The Eighth Circuit subsequently held a United States Department of Agriculture embargo on imports of beef from Canada due to mad cow disease was not a direct physical loss. *Source Food Tech. v. U.S. Fid. and Guaranty*, 465 F.3d 834, 835 (8th Cir. 2006) (applying Minnesota law). Plaintiff owned a load of beef product that had been manufactured, packaged, and loaded onto a truck by its supplier in Canada. *Id.* Although there was no evidence that plaintiff's beef

- 15 -

product was contaminated by mad cow disease, the plaintiff contended that the loss of use, function, and access to it constituted a "direct physical loss" under the terms of its policy. *Id.* at 835-36. The court held that because the property, namely the beef product, was not physically damaged or contaminated, the plaintiff had failed to establish a direct physical loss. *Id.* at 837-38.

Reduced consumer demand resulting from a limitation on an insured's business operations at the insured premises due to a governmental order is not a "direct loss." *Brothers Inc. v. Liberty Mut. Fire Ins. Co.*, 268 A.2d 611 (D.C. 1970). In *Brothers*, the local government imposed a 5:30 p.m. curfew and prohibited the sale of alcoholic beverages in response to riots following the assassination of Martin Luther King, Jr. *Id.* at 611-12. The insured's policy covered "direct" losses to covered property from riot and civil commotion; however, the Court held that the policy did not provide coverage for the plaintiff's claims because the "business 'fall-off'" resulting from the inability to conduct business on its premises after 5:30 p.m. was not a "direct" loss by a riot. *Id.* at 613. Rather, the court found that "[a]t the most, the loss incurred here was an indirect, if not remote loss resulting from riots." *Id.* That is precisely the situation here.

The phrase "direct physical loss" requires more than a temporary and partial limitation of operations at Plaintiffs' premises. Such a claim is insufficient to bring it within the express terms of the insurance contract between the parties. "Direct physical loss" requires damage to the structural integrity of Plaintiffs' restaurants or bars. Plaintiffs' restaurants and bars have sustained no tangible change in their physical structure or composition. Plaintiffs continue to operate their businesses as restaurants and bars, with their operations temporarily limited to take-

- 16 -

out and delivery. Therefore, as a matter of law there is no coverage for lost business income/extra expense due to the reduction of Plaintiffs' operations under the Society Policy.

C.     **The Period of Restoration Clause is Further Evidence that "Physical" Loss or Damage Requires a Tangible Change in the Physical Characteristics of Property.**

The fact that the Business Income Additional Coverage of the Society Policy only provides coverage for loss of business income to that sustained during the "period of restoration" further demonstrates the meaning of the requirement of "physical" loss or damage. "Period of Restoration" refers to the period of time that:

a.     Begins immediately after the time of direct physical loss or damage for Business Income or Extra Expense coverage caused by or resulting from any covered Cause of Loss at the described premises; and

b.     Ends on the earlier of:

(1)     **The date when the property at the described premises should be repaired, rebuilt or replaced** with reasonable speed and similar quality; or

(2)     The date when business is resumed at a new permanent location.

(Dkt. 14-1, p. 85; Dkt. 14-2, p. 92; Dkt. 14-3, p. 26; Dkt. 14-4, p. 101; Dkt. 14-5, p. 73; Dkt. 14-6, p. 100; Dkt. 14-7, p. 75; Dkt. 14-8, p. 78; Dkt. 14-9, p. 80)

The Court should construe the policy as a whole and give meaning to each provision. *Day*, 2011 WI 24, ¶ 28. The definition of "period of restoration" provides additional context to the intended meaning of "physical loss or damage" as used in the Society Policy. Read together, it is clear the phrase "physical loss of or damage to" does not encompass a temporary loss of use, without more. Rather, it refers to a loss or damage that requires the repair, rebuilding, or replacement of the property. *See, e.g.*, *Newman Myers*, 17 F. Supp. 3d at 332 (explaining that use of "repair" and "replace" in period of restoration clause "contemplate physical damage to the insured premises as opposed to loss of use of it"); *Roundabout Theatre*, 302 A.D.2d at 8 (same).

- 17 -

Here, there is no "period of restoration" because there is nothing on the Plaintiffs' premises that needs to be restored, and no reason for Plaintiffs to move their businesses to a new location. The relevant governmental orders establish the very opposite of this requirement – that Plaintiffs can continue to use their restaurants and bars to prepare and serve take-out and delivery.

## II. THERE IS NO COVERAGE UNDER THE CIVIL AUTHORITY COVERAGE BECAUSE PLAINTIFFS CANNOT SHOW THAT THERE WAS DAMAGE TO OTHER PROPERTY THAT CAUSED ACTION OF CIVIL AUTHORITY THAT PROHIBITED ACCESS TO THE INSUREDS' PREMISES

The Society Policy provides as follows:

**k.     Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)**     Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within the area; and

**(2)**     The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for Business Income will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage begins.

Civil Authority coverage for necessary Extra Expense will begin immediately after the time of first action of civil authority that prohibits access to the described premises and will end:

**(1)**     Four consecutive weeks after the time of that action; or

(2) When your Civil Authority coverage for Business Income ends; whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance.

(Dkt. 14-1, p. 61-62; Dkt. 14-2, p. 68-69; Dkt. 14-3, p. 91-92; Dkt. 14-4, p. 77-78; Dkt. 14-5, p. 49-50; Dkt. 14-6, p. 76-77; Dkt. 14-7, p. 51-52; Dkt. 14-8, p. 54-55; Dkt. 14-9, p. 56-57)

Under this section, coverage for Business Income or Extra Expense applies when a Covered Cause of Loss causes damage to property *other than* property at the described premises, (i.e. a third party's property), and action of civil authority prohibits access to the insured's premises as a result. Neither of these prerequisites to coverage exist.

## A. There Was No Damage to Other Property Caused by a Covered Cause of Loss

Plaintiffs do not allege in their Amended Complaint that there was any damage to "property other than property at the described premises" caused by a "Covered Cause of Loss." "Covered Cause of Loss" means "Direct Physical Loss unless the loss is excluded or limited under this coverage form." There was no "direct physical loss" to any property—either the insureds' property or the property of others. The presence or suspected presence of the COVID-19 virus on any premises does not constitute direct physical loss, as explained above.

## B. Access to the Insureds' Premises was Not Prohibited by Civil Authority

The Orders issued by Governors Evers, Walz and Lee did not prohibit access to the insureds' premises. The Orders expressly allowed access, with certain restrictions regarding dine-in services. Employees were allowed to access the premises to prepare food for delivery and carry out orders. Customers were allowed to access the premises to pick up the food. Delivery services were allowed to access the premises to collect the orders that they would then deliver. At no time was access prohibited.

- 19 -

There is little Wisconsin authority interpreting Civil Authority Coverage. In *Adelman Laundry & Cleaners, Inc. v. Factory Ins. Ass'n*, 59 Wis. 2d 145, 207 N.W. 2d 646 (1973), the Wisconsin Supreme Court interpreted a policy that provided coverage for business interruption loss under a provision entitled "Interruption by Civil Authority." The provision differed from Society's Civil Authority provision in several respects, however it required that access to the insured premises had to be prohibited by order of civil authority "as a direct result of the peril(s) insured against." *Id*. at 147. While the insured claimed that it sustained damages as a result of a curfew imposed after the Milwaukee civil disturbance in 1967, access to the insured's premises was not prohibited because of any physical damage to property. In finding no coverage, the Supreme Court relied on *Two Caesars Corp. v. Jefferson Ins. Co*. , 280 A. 2d 305 (D.C. 1971), wherein the Court construed a policy to make a loss compensable only where the order of civil authority prohibiting access to the premises was predicated upon damage to or destruction of business property. *Id.* at 147. The *Adelman* Court explained that the civil authority clause did not delete the requirement of damage or destruction of property, because the extension for civil authority coverage was a coverage extension that included "the actual loss as covered hereunder." *Id*. at 148. The Civil Authority coverage in the Society policy requires damage to other property caused by a Covered Cause of Loss, i.e. direct physical damage. Like in *Adelman,* there was no direct physical damage to property which prohibited access to the insureds' property. Thus, there was no damage caused by a Covered Cause of Loss under Society's Policy.

Cases from other jurisdictions are instructive. In *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128 (2d Cir. 2006) United Air Lines sought recovery for losses caused by the temporary shutdown of Reagan Washington National Airport following the September 11,

- 20 -

2001 terrorist attacks. *Id.* at 129. United invoked a substantially similar clause, providing coverage "when access to the Insured Locations is prohibited by order of civil authority as a direct result of damage to adjacent premises." *Id.* According to United, the shutdown was due to damage at the Pentagon nearby. *Id.* The Second Circuit found there was no coverage because, even assuming the Pentagon could be considered "adjacent premises," the government's "decision to halt operations at the Airport indefinitely was based on fears of future attacks," not the fact that the Pentagon was damaged. *Id.* at 134.

Just as in *United*, the "order of a civil authority" at issue here has everything to do with protecting human life by controlling when and how people assemble in particular places, and nothing to do with any damaged property. No damaged property is referenced in the Executive Orders, and Plaintiffs do not identify any particular property that is or was physically damaged. The Court should follow *United* and conclude that there is no damage that falls under the "Civil Authority" provision of the Society Policy. *See also, e.g., Paradies Shops, Inc. v. Hartford Fire Ins. Co.,* 2004 WL 5704715, at *1-2, *6-8 (N.D. Ga. Dec. 15, 2004) (holding that there was no coverage in part because the FAA's order that grounded planes after September 11th was not a "direct result" of property damage) (App. 17); *S. Tex. Med. Clinics, P.A. v. CNA Fin. Corp.,* 2008 WL 450012, at *10 (S.D. Tex. Feb. 15, 2008) (evacuation of county before hurricane making landfall was "due to" fear of future damage rather than existing damage). (App. 18)

Plaintiffs cannot establish that there was damage to other property or that access to their property was prohibited by civil authority. Therefore, there is no coverage for Plaintiffs' loss of business income/extra expense under the Civil Authority coverage of Society's policies.

III. **THERE IS NO COVERAGE UNDER THE CONTAMINATION COVERAGE BECAUSE PLAINTIFFS CANNOT SHOW THAT THERE WAS (a) CONTAMINATION WHICH RESULTED IN ACTION BY A PUBLIC HEALTH OR OTHER GOVERNMENTAL AUTHORITY THAT PROHIBITED ACCESS**

- 21 -

**TO THE INSUREDS' PREMISES OR PRODUCTION OF THE INSUREDS' PRODUCT, (b) A CONTAMINATION THREAT, OR (c) PUBLICITY OF THE DISCOVERY OR SUSPICION OF CONTAMINATION**

The Society Policy provides as follows:

### m. Contamination

If your "operations" are suspended due to "contamination":

**(1)** We will pay for your costs to clean and sanitize your premises, machinery and equipment, and expenses you incur to withdraw or recall products or merchandise from the market. We will not pay for the cost or value of the product.

The most we will pay for any loss or damage under this Additional Coverage arising out of the sum of all such expenses occurring during each separate policy period is $5,000; and

**(2)** We will also pay for the actual loss of Business Income and Extra Expense you sustain caused by

**(a)** "Contamination" that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product.

**(b)** "Contamination threat"

**(c)** "Publicity" resulting from the discovery or suspicion of "contamination".

Coverage for the actual loss of Business Income under this section will begin immediately upon the suspension of your business operations and will continue for a period not to exceed a total of three consecutive weeks after coverage begins.

Coverage for necessary Extra Expense under this section will likewise begin immediately upon the suspension of your business operations and will continue only for a total of three consecutive weeks after coverage begins, or until the loss of Business Income coverage ends, whichever is longer. The coverages under this section may not be extended nor repeated. The definitions of Business Income and Extra Expense, contained in the Business Income and Extra Expense Additional Coverages section shall also apply to the additional coverages under this section.

**(3)** Contamination Exclusions

- 22 -

All exclusions and limitations apply except Exclusions **B.2.j.(2)** and **B.2.j.(5)**

**(4)** Additional Definitions:

    **(a)** "Contamination" means a defect, deficiency, inadequacy or dangerous condition in your products, merchandise or premises.

    **(b)** "Contamination threat" means a threat made by a third party against you to commit a "malicious contamination" unless the third party's demand for money or other consideration is met.

    **(c)** "Malicious contamination" means an intentional, malicious and illegal altercation or adulteration of your products

    **(d)** "Publicity" means a publication or broadcast by the media, of the discovery or suspicion of "contamination" at a described premise.

(Dkt. 14-1, p. 62-63; Dkt. 14-2, p. 69-70; Dkt. 14-3, p. 92-93; Dkt. 14-4, p. 78-79; Dkt. 14-5, p. 50-51; Dkt. 14-6, p. 77-78; Dkt. 14-7, p. 52-53; Dkt. 14-8, p. 55-56; Dkt. 14-9, p. 57-58)

Plaintiffs allege that "COVID-19 constitutes Contamination that resulted in the Closure Orders that prohibits access to the described premises or the production of product." (Dkt. 14, Amended Compl. ¶ 123) "Contamination," as defined in the Policy, is "a defect, deficiency, inadequacy or dangerous condition in your products, merchandise or premises." When, as here, an insured is able to use premises for food preparation and sale, those premises are not defective, deficient, inadequate or dangerous. Clearly, because the Plaintiffs were allowed to continue to use their premises to produce product for takeout and delivery, neither the premises nor the product were contaminated. They therefore were not defective, deficient, inadequate or dangerous.

Furthermore, in order to recover Business Income or Extra Expense under the Contamination Coverage, the Plaintiffs would have to show that "Contamination" resulted in an action by a public health or other governmental authority to *prohibit* access to the described

- 23 -

premises or production of your product. As noted, access to Plaintiffs' premises was not prohibited and production of Plaintiffs' products was not prohibited. They were allowed to use their premises to produce their product for customers. The Executive Orders did not require closure or restriction of the Plaintiffs' operations due to contamination. The Orders merely limited operations to take-out and delivery, due to the desire to prevent the spread of COVID-19 from personal contact between humans.

Finally, there is no allegation that the alleged loss of Business Income and Extra Expense was caused by a "contamination threat," which is defined as a threat made by a third party against the insured to commit a malicious contamination, or was caused by "publicity" resulting from the discovery or suspicion of contamination.

Plaintiffs cannot establish that their premises or product were contaminated, or that a governmental authority prohibited access to their premises or production of their product, which is necessary to trigger coverage under the Contamination Coverage in the Society policy. Therefore, Plaintiffs' loss of business income/extra expense is not covered under the Contamination coverage of the Society policies.

## IV.   THERE IS NO COVERAGE UNDER THE "SUE AND LABOR" CLAUSE

The Society Policy provides as follows:

**3.  Duties In the Event Of Loss Or Damage**

    **a**.  You must see that the following are done   in the event of loss or damage to Covered Property:

***

    **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.  However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is

- 24 -

> not a Covered Cause of Loss. Also, if feasible, set the damaged property
> aside and in the best possible order for examination.

(Dkt. 14-1, p. 52; Dkt. 14-2, p. 83; Dkt. 14-3, p. 106; Dkt. 14-4, p. 92; Dkt. 14-5, p. 64; Dkt. 14-6, p. 91; Dkt. 14-7, p. 66; Dkt. 14-8, p. 69; Dkt. 14-9, p. 71)

Plaintiffs allege that in complying with the Closure Orders and otherwise suspending or limiting operations, they incurred expenses in connection with reasonable steps to protect Covered Property. (Dkt. 14, Amended Compl. ¶140)   They allege that they are entitled to reimbursement for the amount they "reasonably incurred to protect Covered Property from further damage by COVID-19." (Dkt. 14, Amended Compl. ¶ 177)

Plaintiffs refer to this provision as "Sue and Labor Coverage." This provision is found in the "Property Loss Conditions" section of the policy. It is not a coverage grant - it is a Condition that the Insured is required to comply with. It does not provide separate coverage. Furthermore, this provision refers to protecting "Covered Property" from further damage, not to business income or extra expense losses. Plaintiffs are not making a claim for damage to "Covered Property," they are making a claim for loss of business income and extra expense. Finally, this provision provides that Society will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. In order to be a Covered Cause of Loss, there must be direct physical loss. As explained above, there was no direct physical loss to Plaintiffs' property. Therefore, even if this provision did provide coverage, as Plaintiffs claim, it is inapplicable because the claimed loss is not a Covered Cause of Loss. This policy provision has no application to Plaintiffs' claims.

## V.  THE ABSENCE OF A VIRUS EXCLUSION DOES NOT MEAN VIRUS RELATED LOSSES ARE COVERED

The Amended Complaint alleges that Society's Special Property Coverage Form does not include any exclusion for losses caused by viruses or communicable diseases. (Dkt. 14,

- 25 -

Amended Compl., ¶ 11 and ¶ 39)  While not specifically stated, the inference is that the absence of such an exclusion means that losses related to viruses are covered.  This is not how insurance policies are interpreted.  The three step process for determining coverage set forth in  *American Family Mut. Ins. Co. v. American Girl, Inc., supra,* requires examination of the initial coverage grant, and if it is clear that there is no coverage granted, the analysis ends there.  The existence or absence of exclusions is of no consequence if there is no initial grant of coverage.  *See also Standard Fire Ins. Co. v. Chester O'Donley & Associates, Inc.*, 972 S.W. 2d 1, 7 (Tenn. App. 1998) ("The insuring agreement sets the outer limits of an insurer's contractual liability.  If coverage cannot be found in the insuring agreement, it will not be found elsewhere in the policy.") Here, there is no initial grant of coverage under the policy, for the reasons set forth above.  Thus, there is no need for further analysis of the policy.  The absence of an exclusion for losses caused by viruses does not reinstate coverage that never existed in the first place.

## VI.    THE CONSEQUENTIAL LOSSES EXCLUSION APPLIES

The Society Policy contains the following exclusion:

> **2.**    We will not pay for loss or damage caused by or resulting from any of the following:
>
> ### a.  **Consequential Losses**
>
> Delay, loss of use or loss of market.

(Dkt. 14-1, p. 72; Dkt. 14-2, p. 79; Dkt. 14-3, p. 102; Dkt. 14-4, p. 88; Dkt. 14-5, p. 60; Dkt. 14-6, p. 87; Dkt. 14-7, p. 62; Dkt. 14-8, p. 65; Dkt. 14-9, p. 67)

While there is no Wisconsin authority discussing this exclusion, other jurisdictions have held that losses that are a consequence of any other reason besides actual physical loss are not covered. In *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.,* 958 F. Supp. 594, 604 (S.D. Fla. 1997), an insured claimed loss of business income due to physical damage caused by a hurricane. However, the Court determined that the loss of business income, if any, was not due to property

- 26 -

damage, since its lack of sales resulted from factors other than the damage caused by the hurricane.  The Court stated:

> To recover under the business interruption policy in this case, Dictiomatic must prove that it sustained damage to property that is covered under the policy and that the damage was caused by a covered cause of loss, that there was an interruption to the business ("suspension of operations") which was caused by the property damage, and that there was an actual loss of business income during the period of time necessary to restore the business and that the loss of income was caused by the interruption of the business and not by some other factor or factors.

*Id*. at 602 (Citations omitted).

Here, as stated above, there is no direct physical loss to the Plaintiffs' property. Even if there had been direct physical loss to Plaintiffs' property, however, Plaintiffs' damages would not stem from that property damage.  Plaintiffs' damages stem from the Executive Orders by Governors Evers, Walz and Lee prohibiting restaurants and bars from allowing customers to consume food or beverage on the premises. People were also encouraged to stay home and only leave the home as necessary (which could include going to restaurants and bars for takeout or having delivery to their homes).  The loss claimed did not result from a direct physical loss, but instead a loss of market due to the Orders encouraging people to stay home and prohibiting dine-in services. Thus, the loss of market exclusion applies to the damages sought in the Amended Complaint.

## VII.   THE ACTS OR DECISIONS EXCLUSION APPLIES

The Society policy contains the following exclusion:

> **3.**   We will not pay for loss or damage caused by or resulting from any of the following **B.3.a**. through **B.3.c.** But if an excluded cause of loss that is listed in **B.3.a**. through **B.3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss….
>
> **b.  Acts Or Decisions**

> Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

(Dkt. 14-1, p. 74; Dkt. 14-2, p. 81; Dkt. 14-3, p. 104; Dkt. 14-4, p. 90; Dkt. 14-5, p. 62; Dkt. 14-6, p. 89; Dkt. 14-7, p. 64; Dkt. 14-8, p. 67; Dkt. 14-9, p. 69)

This exclusion was cited in *Cytopath Biopsy Laboratory, Inc. v. U.S. Fidelity and Guar. Co.*, 774 N.Y.S. 2d 710, 6 A.D. 3d 300 (2004) by the New York Supreme Court, Appellate Division when it held that there was no coverage for business interruption losses to plaintiff who was ordered to shut down after a discharge of noxious fumes in its building. The Court stated that plaintiff failed to establish that its losses stemmed from a direct physical loss to property, finding that "the real losses claimed herein resulted from refusal by the authorities to permit resumption of operations until proper permits were obtained and a more acceptable ventilation system was installed." *Id*. at 711. The Court referenced the Acts or Decisions exclusion in finding that summary judgment was appropriately granted to the insurer. *Id*. at 711.

Similarly here, the Plaintiffs' loss of business income was not due to direct physical loss to property, as explained above. The losses resulted from the Acts or Decisions of governmental authority to limit Plaintiffs' operations to take-out and delivery services.

## Conclusion

Based on the foregoing arguments and authorities, the Society policies do not provide coverage to Plaintiffs for their claimed loss of business income/extra expenses resulting from the Governor's Orders limiting their business operations to take-out and delivery services. They suffered no direct physical loss to their property. They were not prohibited from accessing their premises by Civil Authority. There was no contamination of their premises or product. The Society policy does not cover Plaintiffs claims, and their Amended Complaint should be dismissed.

Dated this 15th day of June, 2020.

*Electronically signed by Heidi L. Vogt*

Heidi L. Vogt, SBN
Beth J. Kushner, SBN
Janet E. Cain, SBN
Christopher E. Avallone, SBN
*Attorneys for Defendant Society Insurance*
**von BRIESEN & ROPER, s.c.**
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Vogt Phone:  (414) 287-1258
Fax :  (414) 276-1122
Emails: hvogt@vonbriesen.com
           bkushner@vonbriesen.com
           jcain@vonbriesen.com
           cavallone@vonbriesen.com

34883703_1

- 29 -